Filed 5/19/25  In re Joseph P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Joseph P. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.P. et al.,<br><br>    Defendants and Appellants. | E084575<br><br>(Super.Ct.No. RIJ2200411)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant, D.P.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, A.R.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham, Julie Jarvi, and Samara Silverman, Deputy County Counsel, for Plaintiff and Respondent.

BACKGROUND

A.R. (Father) appeals from the termination of his parental rights to his minor son, Andres R. D.P. (Mother) appeals from the termination of her parental rights to her minor sons, Andres and Joseph P. (collectively, the children). The parents argue that the juvenile court erred by failing to apply the beneficial parental relationship exception under subdivision (c)(1)(B)(i) of Welfare and Institutions Code section 366.26 (unlabeled statutory references are to this code). Father also argues that the Riverside County Department of Public Social Services (DPSS) and the juvenile court failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related state law. We disagree and affirm.

I.      *Detention*

"[Mother and] Father's one-year-old son, Andres R., [and Mother's nearly four-year-old son, Joseph P.,] came to DPSS's attention in May 2022, when [Mother] called law enforcement to report domestic violence. Mother reported that Father put her in a headlock and choked her. She freed herself from the headlock and tried to call law enforcement, but Father grabbed her phone and threw it. He then drove off. Mother put Andres and his two half siblings in her car, which contained only one car seat, and chased Father's car. She called law enforcement during that chase. Andres and his

half[ ]siblings witnessed the altercation but were not injured. [Fn. omitted.] Mother refused an emergency protective order. [¶] . . . [¶]

"Mother came out of the hotel room after the officers took Father away. She told the social worker that Father was upset the day before because paternal grandfather had been killed. Father 'got in her face,' put her in a headlock, and choked her. She had red marks on both sides of her neck. She allowed Father to return to the hotel room after the incident because she loved him and he lived there. She described Father as a good man and a good father, and she said that yesterday was the first time 'he ha[d] ever done anything like this.' [¶] . . . [¶]

"The social worker also reported on the condition of the family's hotel room and included photographs with the detention report. Trash and other things were all over the floor, and the room was very dark because the lights did not work. The social worker tripped twice as she was trying to navigate the room and asked Mother to open the curtains. The window had two large cracks in it, and the mirrored closet door was also cracked. The parents had divided the room by hanging a tarp across it. There were piles of boxes, bags, and other objects against every wall and a makeshift wall and a tall pile of items behind the couch. A makeshift fan was hanging from the ceiling in the bathroom, and the floor in there was also littered with trash, including acrylic paint bottles. The counter in the kitchenette area was covered with items, including a blade within the children's reach. The social worker asked Mother to clean up the room as much as possible so that the children did not trip or hurt themselves.

"Mother told the social worker that she did not have any Indian ancestry.[1] The worker was unable to ask Father about Indian ancestry because of his refusal to be interviewed.

"DPSS applied for a protective custody warrant for the removal of the children under section 340, and the court issued the warrant on the same day. DPSS also filed a petition under section 300, subdivision (b)(1), alleging in relevant part that (1) the parents neglected [the children's] health and safety because the family's residence (the hotel room) was 'found in deplorable conditions,' (2) [the parents] abused controlled substances, (3) the parents engaged in ongoing acts of domestic violence in [the children's] presence, and (4) Father had a criminal history, including an arrest and/or conviction for felony inflicting corporal injury on a spouse.

"At the detention hearing in June 2022, Mother requested that the court issue an emergency protective order restraining Father. Her counsel stated that she did not agree to one earlier because she did not understand the request, but Mother was now 'more than happy to do whatever' DPSS requested. Father objected to the request for an emergency protective order. He argued that the order was unnecessary because (1) he was in custody, and (2) the altercation was an isolated incident. Father's counsel indicated that Father might have Cherokee ancestry, and Father filed Judicial Council form ICWA-020 (Parental Notification of Indian Status) indicating that Andres might be eligible for

---

**1** Because ICWA uses the term "Indian," we use it as well "to reflect the statutory language." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*).) No disrespect is intended.

4

membership in the Cherokee tribe." (*In re Andres R.* (2023) 94 Cal.App.5th 828, 836-838 (*Andres R. I*).)

Mother's counsel told the court that Mother did not have Indian ancestry.

"The court detained Andres from the parents and issued a temporary restraining order (TRO) protecting Mother from Father. Additionally, the court found that ICWA may apply to Andres." (*Andres R. I*, *supra*, 94 Cal.App.5th at p. 838.)

II.     *Jurisdiction and disposition*

"DPSS again interviewed Andres's half[ ]sister and Mother in preparation for the jurisdiction and disposition hearings. The half[ ]sister reported that she saw Father 'roll[]' Mother 'all over the bed' and choke Mother. Mother asserted that Father had never 'laid a hand on' her before the choking incident and that he was upset because paternal grandfather had been murdered. She again asserted that Father had always been good to her and the children.

"Father's counsel did not permit DPSS to interview him about the domestic violence allegations. However, Father answered questions about his social history and background. Father claimed to have Cherokee ancestry. Paternal grandmother reported that neither she nor paternal grandfather had Indian ancestry. Father said that he would do whatever was necessary to have Andres returned to his care. When the social worker asked about placement, Father responded: '"I don't like that they're trying to keep the kids together. I feel like my son was taken from me because of her [Mother] and her kids."' He wanted DPSS to place Andres with paternal grandmother or paternal aunt.

5

Paternal grandmother was willing to care for Andres and his half siblings, so DPSS submitted a resource family referral on her behalf. After Father was released from custody, he had supervised visitation with Andres twice per week." (*Andres R. I*, *supra*, 94 Cal.App.5th at pp. 838-839.)

Mother again denied having any Indian ancestry and told the social worker that neither Andres nor Father has any Indian ancestry and that Father was "'just trying to figure out ways to get Andres back sooner.'" Andres's paternal grandmother also told DPSS that there was no Indian ancestry in Father's family and said, "'I'm Mexican and [Father's] father is Cuban.'"

"DPSS gave Father referrals for housing assistance, random drug testing, substance abuse treatment programs, parenting education, and domestic violence services at a mental health agency. Father drug tested negative and provided proof of enrollment in parenting education, anger management, and counseling services. He also provided a letter from a substance abuse treatment program stating that he did not meet the medical requirements for treatment.

"At the jurisdiction hearing in July 2022, the parents requested that the court set the matter for contest, so the court continued the hearing. With respect to the TRO, Mother asked the court to allow the TRO to expire. The court granted that request, and the TRO expired that day." (*Andres R. I*, *supra*, 94 Cal.App.5th at p. 839.)

In an addendum report, DPSS noted that the parents had "consistently participated in visits with the children twice a week for two hours each visit at the DPSS office."

6

"Father continued to visit Andres twice per week for two hours and was engaging in domestic violence services. He had taken three random drug tests with negative results and failed to appear for a fourth test. DPSS was waiting for Father's substance abuse and parenting education providers to confirm his attendance at those programs." (*Andres R. I*, *supra*, 94 Cal.App.5th at p. 839.)

DPSS sent notice of the contested jurisdiction and disposition hearing to the United Keetoowah Band of Cherokee Indians and the Eastern Band of Cherokee Indians.

"DPSS contacted the Cherokee Nation and asked whether the parents, paternal grandparents, or Andres were enrolled members of the tribe or eligible to enroll. The tribe responded that Andres was not an Indian child in relation to the Cherokee Nation. [¶] . . . [¶]

At the contested jurisdiction and disposition hearing in August 2022, "[t]he court struck the substance abuse allegation. But it found true the allegations that (1) the family's residence was unsafe, (2) the parents were engaged in ongoing domestic violence, and (3) Father had a misdemeanor conviction for spousal abuse. (The court also found true that Mother had an extensive criminal history and neglected the medical and educational needs of Andres and his half siblings.) The court took jurisdiction over [Joseph and] Andres on the basis of the sustained allegations.

"As for disposition, DPSS had placed [Joseph and] Andres with paternal grandmother a few days before the hearing. Father stated that he approved of Andres's

7

placement with paternal grandmother and that he was 'submitting on family reunification services.'

"The court made the required findings under section 361, subdivision (c)(1), by clear and convincing evidence and adjudged [the children] dependent[s] of the court. It removed [the children] from the parents' physical custody and ordered reunification services for [the parents]. The court found that DPSS had made reasonable efforts to eliminate the need for removal. The court also found that ICWA did not apply [with regard to the Cherokee Nation of Oklahoma]." (*Andres R. I*, *supra*, 94 Cal.App.5th at pp. 839-840.)

III. *Six-month review hearing*

"Father's case plan included general counseling, a domestic violence program, a parenting education class, and on-demand drug testing. Father's visits with Andres were ordered supervised, but the juvenile court authorized DPSS to liberalize visitation.

"In its six-month status review report, DPSS recommended that [the parents'] reunification services be terminated. The report advised the court that Father's unpredictable and combative behavior with DPSS's staff, visitation monitors, and the child's caregiver during supervised visits contributed to DPSS's opinion that one-year-old Andres could not yet be returned to Father's care without posing a risk of harm to the child. DPSS reported that Father's monitored visits with Andres required 'more extreme supervision' and additional precautions, because Father's repeated confrontations with DPSS's staff, visitation monitors, and the child's caregiver left them feeling unsafe. At

8

one visit, Father attempted to leave DPSS's office and threatened to abscond with Andres and Andres's half[ ]sibling, Joseph, ultimately requiring police intervention.  [Fn. omitted.]  Law enforcement warned Father that he would be arrested if he left DPSS's office with the children, but Father continued to argue and insist that he had court authorization to do so.

"The social worker reported that DPSS had offered Father a psychological assessment so that DPSS could determine whether there were any underlying issues that needed to be addressed and to identify any additional services that could be offered to Father to assist him with reunification.  Father refused to participate, and no additional services were identified.

"DPSS also informed the court of Father's ongoing request for unsupervised and extended visits with both Andres and Joseph.  But the social worker observed that the quality of Father's visits had fluctuated and that, in addition to the expressed concerns regarding Father's inability to control his behavior, Father had moved twice and could not provide a stable home address for DPSS to conduct a home assessment."  (*Andres R. v. Superior Court of Riverside County* (Apr. 29, 2024, E083019) [nonpub. opn.] (*Andres R. II*).)

Mother reported that she was still living in the motel room and that Father no longer lived there.  DPSS explained to Mother that it was concerned about the overall condition of her residence, and Mother said that she needed to "clean and organize the room" and requested that the children be allowed to visit there.

9

During one visit in October 2022, Father and Mother "occupied some of their visitation time with the children, to ask the caregiver why the children had any bruises or markings. There were also confrontations between the parents and the FFA social worker, causing a strain in the relationship, between the FFA social worker and the caregiver with the parents." After the visit, the caregiver became concerned about her safety and stopped supervising visits, and DPSS separated the parents' visits.

DPSS reported that Joseph was developing appropriately and meeting "most" developmental milestones. The social worker noted that Joseph had some speech delays and should be receiving speech therapy. DPSS reported that in November 2022, Andres "was diagnosed with profound language delay."

DPSS reported that Mother had been present "for more than 90% of her visits," and she "implement[ed] appropriate parenting skills, [fed] the children, tend[ed] to their emotional and physical well-being," and there were no concerns with Mother's parenting. DPSS also reported that Mother "attend[ed] every scheduled visitation" with the children. Mother had made "considerable progress," but she was still struggling with maintaining a suitable and safe residence for the children.

As to Father's progress, DPSS reported that he "began to implement parenting skills such as addressing and redirecting the children, using age-appropriate play time, and tending to their emotional and physical well-being frequently." DPSS nonetheless reported that Father had demonstrated unpredictable behavior during visitation. DPSS believed that he had not shown that he could "fully implement problem-solving skills,

and anger management skills when handling matters which cause[d] concern for [DPSS] on the safety and risk of the child Andres when [Father] becomes triggered, angry, or overwhelmed." Father "struggled to maintain a cohesive relationship" with others and responds in a "combative manner." DPSS believed that Father's attempt to take Andres from the visitation room resulting in law enforcement intervention "had an impact on the children and visitations had to be revised with more extreme supervision" for the safety of others and the children.

Father told DPSS that ICWA applied to Andres "because he was a part of the Guajiro, Taino Nations territory tribe in Perico, Matanzas, Cuba." The social worker also interviewed Mother, who said that her family had Cherokee heritage, but she did not have any documentation to share with DPSS and "needed to speak to the Bureau." DPSS spoke to the maternal aunt, who reported that she did not know about any of her family having Indian ancestry. The social worker called Andres's paternal grandmother, and she said that she was "unsure" about any Indian ancestry. The paternal grandmother told DPSS that Andres's paternal aunt had found some Indian ancestry through an ancestry test and that she would complete an ancestry test for herself "soon." The social worker called the paternal aunt and left a message asking about Indian ancestry, but the social worker had not gotten a response at the time of the report. The social worker also asked for the phone numbers of three of Andres's paternal relatives, I.R., C.R., and S.R., to inquire about Indian ancestry.

11

Mother later told the juvenile court that she had Indian ancestry and that she "was given information about the relatives that were a part of the Cherokee Nation tribe," and the court found that ICWA may apply and ordered DPSS to conduct further inquiry. The United Keetoowah Band of Cherokee Indians had determined that Andres did not meet the definition of an Indian child as it related to their tribe, the Eastern Band of Cherokee Indians had determined that Andres was neither registered nor eligible to register with their tribe, and the Cherokee Nation had determined that Andres was not an Indian child in relation to that tribe.

"In a subsequent addendum report, . . . DPSS changed its recommendation and requested that Father continue to receive reunification services. Father's visits had begun to show improvement, and Father was participating in individual counseling and a parenting program. But DPSS still had safety concerns. DPSS noted that Father continued to minimize the domestic violence incident that occurred in front of the children; denied that any trauma was inflicted upon the children by the exposure to domestic violence; was paranoid that 'everyone [was] hiding things from him and working against him'; commented that DPSS, the attorneys, and service providers were all in a conspiracy to keep his and other people's children from them; and remained unable to manage his anger appropriately.

"The court held the contested six-month review hearing in February 2023. After denying Father's request to represent himself, the court adopted DPSS's recommendation for continued reunification services for [the parents]. The court found that Father's

12

progress toward alleviating or mitigating the causes necessitating placement was 'minimal' and that DPSS had provided Father with reasonable services to assist him in overcoming the problems that led to Andres's removal and continued out-of-home placement. The court also found that returning [the children] to [the parents'] physical custody would create a substantial risk of detriment to the [children]'s safety and welfare. The court ordered [the parents] to participate in a psychological evaluation." (*Andres R. II*, *supra*, E083019.)

IV.    *Twelve-month review hearing*

"About one month before the scheduled 12-month review hearing, DPSS requested an order temporarily suspending Father's visits until he completed the court-ordered psychological evaluation. DPSS's request was prompted by another altercation at one of Father's visits, which again required police intervention because of Father's erratic and aggressive behavior.

"During that incident, Father was at DPSS's office for a supervised visit with Andres and Joseph when Father noticed a scratch on Joseph's neck and demanded that the children's foster home be changed. The social worker described Father's tone during the confrontation as inappropriate and observed that Father's behavior was becoming increasingly erratic. Father had told the social worker that he had '[d]iplomatic immunity,' that he was providing 'revocation consent,' and that he was refusing to participate further in any of his case plan requirements. Father argued that he had done everything required of him and that the children should be returned to him immediately.

13

"The social worker's attempts to deescalate the situation were unsuccessful, and Father attempted to leave DPSS's office with the children. While they were outside, the social worker watched as Father held the children tightly, raised his voice, pointed his fingers, and spoke inappropriately. After Father refused to return to the visitation room with the children, the social worker called 911 for law enforcement assistance. Father eventually released the children to DPSS, but only after further argument in front of the children and after police intervention.

"At a July 2023 hearing on DPSS's request, the juvenile court temporarily suspended Father's visits and set a further hearing on the matter. DPSS subsequently provided an addendum report, giving additional details regarding the prior police incident and noting that Father's erratic and angry behavior caused his children to witness Father's negative interaction with the police. DPSS informed the court that Father did not appear stable and expressed concern about the children's safety. DPSS also reported that Father had not yet completed his court-ordered psychological evaluation, and he did not respond to multiple attempts to schedule the evaluation. DPSS reported that Father was regularly showing up late for visits and that he had at least two no-shows in the reporting period." (*Andres R. II*, *supra*, E083019.)

The children's caregiver reported that she became "tired of the parents calling law enforcement on her and the child abuse hotline," and DPSS had to find a new placement for the children. The caregiver felt harassed by Mother when Mother returned the children after a visit. Mother would yell at the caregiver in front of the children, accusing

14

the caregiver of abuse and neglect. Mother also frequently yelled at the foster family agency social workers and threatened to call the police on the agency. Mother "scared enough of the Foster Family Agency social workers that there was no one else that was willing to help with the transports of the children." The caregiver gave a 14-day notice that she could no longer care for the children, and DPSS found a new foster home placement for them approximately two weeks later.

"At the following hearing, the juvenile court ordered that Father's visits remain suspended, and the court ordered that Father's psychological evaluation be completed.

"DPSS's 12-month status review report recommended that [the parents'] services be terminated. DPSS informed the court that [the parents] still had not completed a psychological evaluation. DPSS reported that because Father never completed the initial consultation, the service provider closed out the referral after leaving multiple messages for him. DPSS then submitted a new referral to the service provider on the same day, but that referral too was closed after Father failed to respond. DPSS submitted a third referral to a different service provider, who also discharged the referral after five failed attempts to reach Father by telephone and text message." (*Andres R. II*, *supra*, E083019.)

The children were happy to see Mother at the start of visits and "separate[d] fine from her" at the end, "but [Mother kept] appearing when that happen[ed] struggling with her emotions saying good-bye, therefore, the children struggle in saying good-bye." Relatives reported that Mother was still using drugs.

15

DPSS reported that there were indications that Mother had a substance abuse problem, that her housing did not appear stable, and that after progressing to unmonitored, overnight visits, she had to return to monitored visits because she appeared to be under the influence of drugs when she arrived at DPSS's office.

DPSS reported that Mother was "trying to coach Joseph on what to report" to the social worker about "placement issues and abuse." DPSS was also concerned about Mother's residence and "the reasoning behind [Mother having] a high tech security system." DPSS reported that Mother "helped to sabotage the children's placement" and that Joseph had to stop attending school because Mother would "not allow him to be immunized."

"DPSS also reported that Father claimed that he did not need any additional services and that he believed he could take the children home with him based on a document that he produced to the social worker, entitled 'Revocation (Withdrawal) of Consent for Services.' Father claimed that he did not need to comply with DPSS or the court's orders because he is a foreign national with Native American ancestry in a federally recognized tribe.

"DPSS concluded that it would be detrimental to reunify [the children] with [the parents] at the 12-month review hearing, because the issues necessitating DPSS involvement had not been resolved. Father had not made substantial progress and refused to engage in further services or submit to a psychological evaluation. Father's visits with Andres were currently suspended, and previously he regularly arrived late to scheduled

16

visits or did not show up at all.  Because Father had made '[n]o substantial progress' and 'the prognosis of reunification [was] minimal,' DPSS recommended termination of Father's services."  (*Andres R. II*, *supra*, E083019.)

A maternal aunt reported that she did not know of any Indian ancestry in Mother's family.  The social worker received no response to a message left for the paternal aunt who had allegedly done an ancestry test that revealed some Indian ancestry.  The social worker also asked Father for phone numbers for various paternal relatives, but he did not provide them.

"In a subsequent addendum report, DPSS advised the court of another altercation involving Father.  During the incident, Father went to DPSS's office, recorded a social worker without permission, and aggressively asked questions about the court's order suspending visits.  DPSS attempted to address Father's concerns.  DPSS made another request to the court for an order prohibiting Father from making video or audio recordings of any DPSS staff or any individuals related to the case without their permission."  (*Andres R. II*, *supra*, E083019.)

When DPSS was seeking a new placement for the children after the previous caregiver informed DPSS that she could no longer care for the children, the social worker spoke to various relatives about placing the children with them.  During those conversations, the social worker asked whether the children had any Indian ancestry.  Only the paternal grandmother indicated that there was Indian ancestry from the "Upper

17

Santiago River Basin at 40.2%," and DPSS learned that the tribe was not a federally recognized tribe.

"In a second addendum report, DPSS attached copies of its delivered service logs and the written report from [the parents'] psychological evaluation[s], which Father had completed a few days before the scheduled date for the 12-month review hearing. DPSS did not change its recommendation that services be terminated." (*Andres R. II*, *supra*, E083019.)

The delivered service logs showed that Father had claimed that he was a registered member of the "Woholio Tribe and Seminole Nation" and that both children were eligible for membership. The social worker also called Father's aunt, who said that she was not aware of any Indian ancestry. The social worker spoke to the maternal grandfather, and he said that there was no "Indian Ancestry."

"The court found that [the parents'] progress toward alleviating or mitigating the causes necessitating placement was 'adequate but incomplete.' The court continued [the parents'] services and reinstated Father's supervised visits with both Andres and Joseph. The court further found that DPSS had provided reasonable services to Father. The court also ordered DPSS to complete an evaluation of Father's home within the next two weeks." (*Andres R. II*, *supra*, E083019.)

The court ordered that DPSS "comply with ICWA noticing in terms of the information that's been brought forth today, specifically with the Woholio and Seminole Nation."

18

V.    *Eighteen-month review hearing*

"DPSS filed an 18-month status review report and an addendum report, advising the court that no substantial progress had been made toward reunification and recommending that services be terminated for [the parents] and a section 366.26 hearing be set.

"DPSS acknowledged that Father had completed his case plan requirements of individual counseling, a domestic violence program, and a psychological evaluation.  But many of DPSS's concerns regarding Andres's safety in Father's care remained.  The social worker could not complete a home evaluation in the reporting period, first because of Father's cancellation of a scheduled appointment and then because of DPSS's discovery that the address given by Father for the evaluation was actually an employer's work address, not a residence.  Father reportedly did not have stable housing and was currently living in a motel room from which he was being 'evicted.'  DPSS also reported that Father had said that there was nothing further he wanted or needed from DPSS.

"DPSS did not believe that Andres could be safely returned to Father's care, observing that Father had not yet resolved his anger management issues and that there was a recently issued warrant for his arrest for assault using force causing bodily injury (Pen. Code, § 245, subd. (a)(4)).  DPSS also expressed concern that Father continued to display aggressive behaviors and engage in confrontations with the social worker, and he continued to disregard the court's order prohibiting him from recording the social worker

19

without the worker's permission. When reminded about the court-ordered prohibition, Father claimed that he did not need permission because he was on 'public property.'

"DPSS also gave an update on the status of Father's supervised visits. Since the reinstatement of his visits at the last hearing, Father arrived late to visits that were scheduled, and failed to show up for visits.

"DPSS also reported that serious allegations emerged from one of Father's visits with the children. Father had been accused of inappropriately touching Joseph while alone in the bathroom, which led to a referral to the child abuse hotline. Because of the disclosures made by Joseph in the ensuing investigation, minor's counsel requested that Father's supervised visits be suspended once again pending a forensic interview of Joseph. The court ordered the forensic interview, suspended all in-person visits between Father and the children, and permitted supervised phone and video visits only with Andres." (*Andres R. II*, *supra*, E083019.)

DPSS reported that Mother had completed a parenting education program and group therapy services for domestic violence. Mother tested positive for amphetamine, methamphetamine, and benzoylecgonine in September 2023. At a medical appointment for Joseph, Mother was disruptive and tried to prevent Joseph from being vaccinated.

DPSS reported that it had asked the maternal grandfather and the maternal aunt whether there was any Indian ancestry in the family, and they both responded that they were unaware of any. DPSS also contacted the paternal grandmother and Father to

determine whether there were any updates regarding Indian ancestry, and the paternal grandmother was awaiting results from Ancestry.com.

"In a second addendum report, DPSS provided the results of Joseph's forensic interview. Joseph disclosed to the interviewer that Father touched him inappropriately on his penis, that he did not like it, that he was angry at Father, and that he no longer wanted to visit with Father. Because of Joseph's disclosure, Father's lack of stable housing, the inconsistent visits, and Father's failure to demonstrate positive changes in addressing his anger issues, DPSS continued to recommend that Father's services be terminated.

"DPSS filed a third addendum report, providing additional information to the court regarding Father's ongoing displays of aggressive behavior. DPSS reported that Father's verbal threats and nonverbal actions were intended to intimidate the social worker, including yelling at the social worker outside of the courtroom and sending the worker inappropriate text messages." (*Andres R. II*, *supra*, E083019.)

Mother had canceled a visit "because she had to work." Mother also told the foster family agency that she refused to have her visits at DPSS's office. DPSS believed that Mother's history of substance abuse had not been addressed and that there was no evidence of her completing substance abuse treatment or benefiting from any such treatment.

DPSS contacted the Bureau of Indian Affairs, the Agua Caliente Band of Cahuilla Indians, the Seminole Nation of Oklahoma, the Seminole Tribe of Florida, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians to ask

whether the children were members or eligible for membership. In an addendum report, DPSS reported that the Cherokee Nation, the Seminole Nation, and the Agua Caliente Band of Cahuilla Indians responded and indicated that the children were not eligible for membership. DPSS was unable to find any information about the Woholio tribe. DPSS also followed up with the paternal grandmother about her Ancestry.com results, and the paternal grandmother did not have further information.

On the date originally scheduled for the 18-month review hearing, the juvenile court asked Father whether he was "aware of having any Native American ancestry from North America," and Father responded, "No. My mother has given her ancestry to the social worker from the South Basin, which is—has to do with the Agua Caliente resort." The court then asked the paternal grandmother what information she had about Indian ancestry. The paternal grandmother responded that her test "came up 42 percent," but she was "not sure yet" which tribe. Mother said that she had Cherokee Nation ancestry. The court then ordered DPSS to "follow up with both parents and relatives with regard to Native American ancestry." At the next hearing, the court ordered DPSS to "obtain further ICWA information from the maternal grandfather" as to the Eastern Band of Cherokee Indians.

Approximately six weeks earlier, the Eastern Band of Cherokee Indians had informed DPSS that Andres was neither registered nor eligible to register with the tribe, and DPSS filed the response with the court. DPSS sent notice of the contested 18-month

22

review hearing to the Seminole Nation of Oklahoma, the Seminole Tribe of Florida, and the Agua Caliente Band of Cahuilla Indians.

"The juvenile court held the contested 18-month review hearing over two days, one in December 2023 and the other in January 2024. Upon Father's request, the court reinstated in-person visits with Andres at the December hearing on the condition that visits be held at DPSS's office or at a service provider's office and that a visitation supervisor be present at all times. Father was still prohibited from visiting with Joseph. [¶] . . . [¶]

"The social worker testified that Father completed the case plan requirements of general counseling, parenting education classes, domestic violence counseling, and a psychological evaluation. The worker also testified that no updates were made to the case plan requirements following Father's psychological evaluation, because of the psychologist's opinion that additional counseling would likely be ineffective and because of DPSS's recommendation to terminate services to Father.

"The social worker clarified that DPSS focused on visitation and the completion of a home evaluation to determine whether visits could be liberalized and whether Andres could safely be returned to Father's care. During the reporting period from September 2023 to December 2023, Father missed approximately 10 of the 15 visits that could have been held. Five of those visits were cancelled by Father, another four were cancelled because of the court's order suspending visits, and one was missed because the paternal

23

grandmother was unavailable to supervise.  The social worker also testified that Father's visits with Andres remained supervised.  [¶] . . . [¶]

"The social worker also testified that Father's visits never progressed from supervised to unsupervised for several reasons, including Father's delay in completing a psychological evaluation, the necessity of police intervention at more than one of Father's visits, Father's inability to show that he benefitted from the services he received, the pending investigation into Joseph's disclosure of inappropriate touching by Father, and the lack of a completed home evaluation.  The social worker testified that returning Andres to Father's custody at the 18-month review hearing was inappropriate because of Father's pending eviction and inability to maintain stable housing, the inconsistency and repeated suspension of Father's visits, and Father's unresolved anger issues.

"The social worker acknowledged that Father did not direct his anger toward the children, and he confirmed that Father's supervised visits with the children were otherwise appropriate.  The worker also acknowledged that no other domestic violence incidents between the parents were reported because the parents were no longer a couple.  Nevertheless, the social worker maintained his recommendation to terminate services, because Father's ongoing displays of hostility and inability to manage his anger toward others posed a risk of detriment to Andres if he were left in Father's care.

"Father testified that the missed visits were DPSS's fault, claiming that he 'was not shown where to go to' and asserting that the social worker was unavailable to him to confirm or schedule visits.  Father also testified that he expected the visits to occur

24

weekly on Fridays, as they had in the past. Father stated that he missed visits only because the current caregiver regularly changed the location, date, and time of the visits. Father conceded that visits did go forward when he confirmed them with the social worker or the visitation monitor." (*Andres R. II*, *supra*, E083019.)

The juvenile court asked Mother and the maternal grandfather whether they had any Indian ancestry, and they told the court that they had Cherokee Nation ancestry. Father told the court "[s]ame information" and that the paternal grandmother was waiting for the Bureau of Indian Affairs to respond. The court asked Father to remind it which tribe the ancestry was from, and Father responded, "Agua Caliente South River Basin."

"Following closing arguments, the court found that [the parents'] 'progress toward alleviating or mitigating the causes necessitating placement' was 'minimal.' The court further found that returning [the children] to [the parents'] care would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. The court found that there was no substantial probability that the children may be returned to [the parents] if [they] were given an additional six months of services. The court also found that DPSS had provided [the parents] with reasonable services. The court terminated reunification services and set a section 366.26 hearing for [the children]." (*Andres R. II*, *supra*, E083019.)

VI.    *Selection and implementation hearing*

DPSS filed a section 366.26 hearing report in April 2024. DPSS reported that the children's current caregiver, who had been caring for them for nearly one year, was

25

"willing and wanting" to adopt them. According to DPSS, the caregiver appeared to have formed a strong bond with the children and was providing a "good and safe home" for them. The children were "prospering in everything that they [were] doing." The children trusted the caregiver, Andres had been potty trained, and Joseph was excelling academically. The caregiver's family was meeting the children's needs, and the children were adjusting to their routines and were healthy.

DPSS reported that the parents had not been consistently visiting their children "even with a set schedule." DPSS sent notice of the section 366.26 hearing to the Seminole Nation of Oklahoma, the Seminole Tribe of Florida, and the Agua Caliente Band of Cahuilla Indians.

The juvenile court continued the section 366.26 hearing to allow DPSS to complete the preliminary adoption assessment. Mother's counsel requested that the court order make-up visits because "visitation ha[d] been a giant issue" during the reporting period. The court ordered that the parents receive make-up visits and directed DPSS to work with Mother and the caregiver to determine what the visitation issues were. The court also ordered an additional visit for Mother on or around Mother's Day and an additional visit for the parents for Andres's birthday.

DPSS filed an addendum report in June 2024. DPSS reported that Joseph "enjoys living in the [caregiver's] home, playing with [Andres] and [his] foster sibling, [and] watching movies with the family." The caregiver described Joseph as affectionate, grateful, and kind, and she had no concerns about Joseph's behavior. DPSS reported that

26

Andres was happy, friendly, and affectionate. Andres had limited speech, and he "happily babbled" to the social worker, "used one-word phrases, signaled, and pointed to communicate with the social worker." The caregiver described Andres as "very loving, kind, curious," and "active." Andres was "well-adapted," and there were no "other developmental concerns or behavioral issues."

The caregiver had "grown healthy attachments with the children," and she was "prepared and eager" to adopt them. The children looked at the caregiver as a "mother-figure," and "are assimilated to [her] home and . . . display significant trust in the prospective adoptive family." The caregiver also had adult children who helped the caregiver and the children in her care.

In July 2024, the juvenile court asked Mother whether she had any Indian ancestry, and Mother said, "Cherokee Nation Eastern Band." The court asked the maternal grandfather whether he had any additional or different information regarding Indian ancestry, and he responded, "No. Just the Cherokee." The court then asked Father whether he had Indian ancestry, and the following exchange occurred:

"[Father]: Miccosukee Tribe of Indians, Florida Seminole, and then I got El Santo off of—here in California.

"THE COURT: Can you spell the latter?

"[Father]: Agua Caliente.

"THE COURT: Agua Caliente. Okay.

"[Father]: My mom is 40 percent—42 percent, and came back in their bloodline.

27

"THE COURT: Okay. So Seminole Florida and Agua Caliente Florida.

"Is that everything?

"[Father]: Yes."

The court ordered DPSS to "follow up on all ICWA information [that had been] provided by relatives" and to "include all information about follow-up in the addendum prior to the next hearing."

Mother's counsel also told the court that visits had not "been going according to plan." Counsel claimed that a visit had been missed because "it was not coordinated with" Mother, and the court ordered that any missed visits were to be made up before the contested section 366.26 hearing.

In an addendum report, DPSS reported that Mother had not completed her June visit or her Easter visit, because the visits were cancelled by the caregiver. The caregiver told DPSS that Mother did not show up for one of the visits, and the other was canceled because Mother "kept changing the meeting place." Mother visited in July and visited an extra hour for one of the missed visits. DPSS contacted Mother to coordinate other missed visits, and Mother responded by text message that she was at work.

DPSS reported that it had given notice to the Agua Caliente Band of Cahuilla Indians, the Cherokee Nation, and the Seminole Tribe of Florida. The Agua Caliente Band of Cahuilla Indians responded that the children were not enrolled or eligible for membership. The Cherokee Nation determined that the children were not Indian children

28

as defined under ICWA. And the Seminole Tribe of Florida responded that the children were not enrolled or eligible for enrollment.

At the contested selection and implementation hearing in late July 2024, Father's counsel requested that Father and Andres testify. Minor's counsel objected to Andres testifying because at a hearing seven months earlier, the court and the parties were unable to elicit any testimony from him. Counsel noted Andres's speech delays and argued that the court should find that Andres was unavailable to testify. Father's counsel argued that Andres should be permitted to testify regarding how Andres "would feel now and whether or not there would be detriment in the future." The court denied Father's counsel's request because Andres was only three years old, did not want to enter the courtroom, and did not want to engage with his attorney earlier that day. The court further noted that the previous attempt to have Andres testify was not "fruitful, because counsel wasn't [able] to coax any meaningful testimony from the child" and that it was uncontroverted that Andres had a speech delay.

Father testified that he visited with Andres "three or four" times since February 2024. Father said that he did not miss any visits, and "visits [had] been changed at last minute and according to the schedule of the caregiver." Father said that Andres was happy to see him at visits and that Andres hugs Father and calls him "'Papa.'" At visits, they watched television together, talked, and did activities that Andres enjoyed. Father said that Andres was sad when the visits ended, and as Andres left he looked back at Father while pulling on the caregiver's hand. Father said that he would pick Andres up,

hug him, and let him know that it was "going to be okay." Father further testified that he would like to have a part in making decisions about Andres's speech therapy. Father said that Andres expressed that he wants to see Father more and tells Father that he loves him.

DPSS called the social worker as a witness. The social worker testified that Father missed a visit in April or May. The social worker said that Father called him in May to confirm the next visit, and Father told the social worker that the visit he missed was "because he had something to do." The social worker also testified that he had not observed any of the visits between Father and Andres.

Before the caregiver was called to testify, Father's counsel stated: "Before we do proceed, I do think the record should reflect that the minor came into the courtroom, ran to mother, hugged her and called her mother, and then hugged the father and called him dad."

The caregiver testified that she had been supervising the visits between Father and Andres. She said that Andres "doesn't call him dad" and that she has not heard Andres say, "'I love you'" to Father. She said that Andres pays more attention to her at visits than he does to Father, and she has never seen Andres cry when a visit ended. The caregiver did not hear Andres say anything to Father when Andres came into the courtroom. The caregiver testified that she had never seen Andres fear Father and that Andres hugs Father when he sees him.

Mother testified that when she saw Andres in the hallway earlier in the day, he ran up to her and screamed, "'Mommy, Mommy, Mommy'" and jumped into her arms. She

30

said that Andres greeted her that way several times that day.  Mother also testified that she missed a visit because there were coordination issues and that when Mother contacted the caregiver, the caregiver said that she was unavailable to take the children to visit.

Mother said that during her visits with the children, they went to the park and played.  For the children's birthdays, Mother decorated the park, got them "a huge birthday cake," presents, hats, masks, and "things that, you know, kids would love."  Mother said that the children did not want the visits to end.  At visits, Mother talked to Joseph about how he was doing, his day, school, grades, and the fun he was having.  Mother said that Joseph told the maternal grandfather that he wanted to return home.  Mother also said that when Andres came into the courtroom, he called Father "'daddy'" or "'dad.'"

Following the close of evidence, Father's counsel argued that the beneficial parental relationship exception applied.  Counsel argued that Father carried his burden of proving that he visited consistently, his relationship with Andres was beneficial to Andres, and their bond was so strong that it would "forever . . . be harmful" to Andres to terminate their relationship.

Mother's counsel also argued that the beneficial parental relationship exception applied.  Counsel argued that Andres loves Mother "very much" and that their "bond is extremely strong."  Mother contended that the issues with visitation "seem[ed] to be more of a logistical issue" and that when "consider[ing] the visits, [M]other is bringing gifts, playing with these kids, and speaking to them about their days and how they are doing in

31

general." Mother argued that "severing the [children's] bonds would be detrimental to [them]."

Minor's counsel argued that the parents had not carried their burden of proving that the beneficial parental relationship exception applied. Counsel stated that "there's a tremendous amount of love there. I think, honestly, they do love their children." Counsel argued, however, that when the case began, Joseph was four years old and Andres was one year old. She stated that Andres is three years old now and had been in foster care for two-thirds of his life, and Joseph had been in foster care until age six, "going on seven." Counsel argued that the parents did not visit consistently, the parents' relationship with the children was not beneficial, and the children's relationships with the parents were not so important that termination of the relationship would be detrimental to the children.

The juvenile court took the matter under submission. In August 2024, the court announced its ruling: "For both of the children, the [c]ourt finds that termination of parental rights would not be detrimental to the minors, and that none of the exceptions contained in Welfare and Institutions Code Section 366.26(c)(1)(a) and/or (b) are applicable in this case, and adoption is in the best interest of the child. [¶] With regard to termination and the exceptions not applying, the [c]ourt relies on the evidence that was pointed to by [minors' counsel]." The court then terminated Mother's parental rights to the children, and it terminated Father's parental rights to Andres.

DISCUSSION

## I. *Father's request for Andres's testimony*

Father first argues that the juvenile court erred by denying Father's request to have Andres testify at the section 366.26 hearing. We disagree.

"[I]t is within the juvenile court's discretion to exclude the testimony of a child in order to avoid psychological harm to the child, even though that testimony is relevant, the child is competent to testify, and the child is both practically and legally 'available' to testify." (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1088.) The court's discretion arises from its responsibility "to preserve and promote the best interests of the child." (*Id*. at p. 1089.) We review the court's ruling for abuse of discretion. (*Id*. at p. 1088.)

Seven months before the section 366.26 hearing, Andres was called to testify at the contested 18-month review hearing. Andres was "walking around," "really interested in the snacks," and "seem[ed] pretty weary." He did not answer any questions. As of June 2024, Andres had limited speech, babbled, and used one-word phrases and signaled to communicate. At the section 366.26 hearing in July 2024, Father's counsel acknowledged three-year-old Andres's "reluctance to come into the courtroom." Under all of these circumstances, the court did not abuse its discretion by determining that the "possible benefit" from Andres's testimony "would not warrant the injury it would cause," considering Andres's very young age, limited speech, and reluctance to be there.

II.     *Beneficial parental relationship exception*

The parents argue that the juvenile court erred by determining that the beneficial parental relationship exception did not apply.  We are not persuaded.

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C*. (2021) 11 Cal.5th 614, 630-631 (*Caden C*.).)  The exceptions allow "'the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'"  (*Caden C*., at p. 631.)

Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Caden C*., *supra*, 11 Cal.5th at pp. 631, 636.)

We review the juvenile court's findings on the first two elements for substantial evidence.  (*Caden C*., *supra*, 11 Cal.5th at pp. 639-640.)  Whether termination of parental rights would be detrimental to the child is a discretionary determination and hence is reviewed for abuse of discretion.  (*Id*. at p. 640.)  But we review any factual findings underlying that decision for substantial evidence.  (*Ibid*.)

When a trial court assesses whether the child would benefit from continuing the relationship, "the focus is the child.  And the relationship may be shaped by a slew of

34

factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632; citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, at p. 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *Caden C.*, at pp. 637-638, fns. 6, 7.)

In determining whether the exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; see *Caden C.*, *supra*, 11 Cal.5th at p. 633.)

35

We assume for the sake of argument that the parents carried their burden of proving that they maintained regular visitation with the children and that there were substantial, positive attachments between Father and Andres and between Mother and the children.

The third element is whether the children shared such a "substantial, positive attachment" to the parents that the harm in severing the parental relationships would "outweigh[ ] 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633, 636.)

The juvenile court did not abuse its discretion by concluding that the benefits of the children's relationships with their parents were not so great that termination of parental rights would be detrimental to the children. The record reflects that Father and Andres had some positive visits and that Andres enjoyed those visits. Father brought food for Andres and played with him, and they hugged. But the caregiver testified that Andres has never cried after a visit ended.

The record likewise shows that Mother and the children had some positive visits and that Mother had "tend[ed] to [the children's] emotional and physical well-being" during visits. The children were happy when they saw her. When the visits ended, the children sometimes struggled to say goodbye, but that was because Mother struggled to say goodbye. And Mother testified that Andres was excited to see Mother at the section 366.26 hearing.

36

But "[a] parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).) Although there is evidence that Andres had a bond with Father and that the children had a bond with Mother, there was no evidence that their relationships were so strong as to outweigh the sense of security and stability of an adoptive home. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent"].) The children's enjoyment of the parents' visits is not sufficient to show that the parents and the children had such a substantial, positive emotional attachment that terminating parental rights would significantly harm the children.

At the section 366.26 hearing, neither parent presented any evidence that the sense of security and stability the children would have in a new adoptive home would be outweighed by whatever detriment might be caused by severance of their relationships with the children. The evidence did show that the children and their parents had some loving contact and pleasant visits. But the evidence also showed that at the time of the children's removal, Joseph was about to turn four years old and Andres was one year old. At the section 366.26 hearing, Joseph had turned six years old and Andres was three years old. The children had therefore spent two years out of their parents' care, and during the second year, they were in a home with a caregiver who wanted to adopt them, had integrated them into her family, and had gained their trust. The children appeared to

have bonded with the caregiver, and the children were "prospering in everything that they [were] doing." Joseph was "excell[ing] academically," and Andres had "been successfully potty trained." They had "become . . . respected family member[s]" in a home with a caregiver who "demonstrated an ability to meet the [children's] emotional, educational, . . . and basic needs." The children were expressing themselves in age appropriate manners, had adjusted to and had healthy bedtime routines, and were in good health.

In sum, there was no evidence that termination of parental rights would harm the children greatly if at all, and there was ample evidence of the substantial benefits that the children would gain from adoption. The court therefore did not abuse its discretion by determining that Father's relationship with Andres and Mother's relationships with the children did not promote the children's well-being to such a degree as to outweigh the benefits that they would receive from a permanent, adoptive home with the caregiver.

III.    *ICWA inquiry*

Father argues that the juvenile court failed to ensure that DPSS complied with ICWA and related state law. Father contends that DPSS failed in its "further inquiry duties" by not contacting the Miccosukee Tribe of Indians. Father further argues that because the court did not make an explicit finding that ICWA did not apply to Andres, reversal is required. We disagree.

The child welfare department and the juvenile court have an "'affirmative and continuing duty to inquire' whether a child in a dependency proceeding 'is or may be an

38

Indian child.'" (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678 (*Ricky R.*).) "The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry." (*Ibid.*)

"The duty of initial inquiry applies in every dependency proceeding." (*Ricky R.*, *supra*, 82 Cal.App.5th at p. 678.) The child welfare department's duty to inquire begins "when first contacted regarding a child." (§ 224.2, subd. (b)(1).)[2] The department must ask the "party reporting child abuse or neglect whether the party has any information that the child may be an Indian child," and the department must also ask the child and the child's family members, including extended family members, upon first contact with those individuals. (*Ibid.*) In addition, if the child is taken into the department's temporary custody under section 306, "or if they were initially taken into protective custody pursuant to a warrant described in Section 340," then the department must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).)[3] Extended family

---

**2**    The Legislature recently enacted Assembly Bill No. 81 (2023-2024 Reg. Sess.) (Assembly Bill 81), which amended section 224.2 effective September 27, 2024. (Stats. 2024, ch. 656, § 3.) We quote that version of the statute.

**3**    Before Assembly Bill 81 was enacted, section 224.2, subdivision (b), stated that the child welfare department had a duty to inquire of extended family members (and others) if the child was placed into the department's temporary custody under section 306, and the statute did not expressly refer to protective custody under section 340. (Former § 224.2, subd. (b), enacted by Stats. 2018, ch. 833, § 5.) Courts interpreting that

*[footnote continued on next page]*

members include adults who are the child's stepparents, grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (§ 224.1, subd. (c)(1).)

The duty of further inquiry is triggered if there is "reason to believe that an Indian child is involved." (§ 224.2, subd. (e).) Under subdivision (e) of section 224.2, there is reason to believe that an Indian child is involved if the court or the social worker "has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).)

Further inquiry includes but is not limited to (1) interviewing extended family members to gather the information required for formal ICWA notice; (2) contacting the Bureau of Indian Affairs for assistance in (i) "identifying the names and contact

---

version of section 224.2, subdivision (b), split on whether the duty to inquire of extended family members was triggered if the department took the child into custody under section 340 pursuant to a protective custody warrant. (See *In re D.M.* (2024) 101 Cal.App.5th 1016, 1026-1046 [describing the split and evaluating the arguments on both sides], review granted July 24, 2024, S285537.) Our Supreme Court is reviewing the issue. (*In re Ja.O.* (2023) 310 Cal.Rptr.3d 728.)

But Assembly Bill 81 recently clarified that aspect of the law by requiring child welfare departments to inquire of extended family members regardless of whether the child was taken into temporary custody under section 306 or protective custody under section 340. (E.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 81 (2023-2024 Reg. Sess.) as amended Aug. 19, 2024, p. 5 [the bill "[c]larifies the timing, duration, and scope of a county department's, and a court's, duty to inquire whether a child is or may be an Indian child"].) That clarification applies to ICWA inquiries and findings that predated the enactment of Assembly Bill 81. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 ["A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment"].)

information of the tribes in which the child may be a member or citizen, or eligible for membership" and (ii) "contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility"; and (3) contacting "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(A)-(C).) "Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case." (*Ibid.*)

The juvenile court may find that ICWA does not apply to the proceedings if it finds "that an agency's inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child." (*Dezi* C., *supra*, 16 Cal.5th at p. 1134.) "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review. [Citations.] '"On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes."' [Citations.] [¶] If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation],

41

there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child. On the other hand, if the inquiry is inadequate, conditional reversal is required so the agency can cure the error and thereby safeguard the rights of tribes, parents, and the child." (*Id*. at p. 1141.)

Father argues that DPSS violated its duty of further inquiry because it "seemingly never inquired with the Miccosukee Tribe of Indians." But Father does not acknowledge that the trial court's determination that the ICWA investigation was proper and adequate is reviewed for abuse of discretion. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) Given the court's and DPSS's extensive and repeated inquiries with the parents, extended family members, and identified tribes throughout this case, as well as both the evidence that Father was making unfounded claims of Indian ancestry and the court's own inquiries of the Father concerning his single mention of the Miccosukee Tribe, it is impossible to find on this record that the court abused its discretion by determining that the ICWA investigation was proper and adequate.

When the case began Mother told the social worker that both she and Father did not have any Indian ancestry, and she told DPSS that Father was "'just trying to figure out ways to get Andres back sooner.'" But DPSS continued to follow up with the parents and relatives including the paternal grandmother, who said that she did not have any Indian ancestry because she is Mexican and the paternal grandfather is Cuban. When the paternal grandmother told DPSS that the paternal aunt had found Indian ancestry through an ancestry test, DPPS called the paternal aunt and did not get a response. Mother later

42

told the court that she believed that she had Cherokee Nation ancestry, and the court ordered DPSS to conduct further inquiry. Each of the Cherokee tribes responded that Andres was not an Indian child. Father later reported that he was a member of the Woholio Tribe and the Seminole Nation, and the court ordered DPSS to follow up regarding those tribes. DPSS contacted the Seminole tribes and could not locate a "Woholio Tribe."

In July 2023, DPSS spoke to several relatives including the maternal aunt, the paternal grandmother, a paternal great-uncle, two paternal great-aunts, and the maternal grandfather, and each responded that they had no Indian Ancestry. Paternal grandmother reported having Upper Santiago River Basin ancestry, and DPSS determined that the tribe was not federally recognized.

DPSS contacted the Bureau of Indian Affairs, the Agua Caliente Band of Cahuilla Indians, the Seminole Nation of Oklahoma, the Seminole Tribe of Florida, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians to inquire whether the children were members or eligible for membership, and the Cherokee Nation, the Seminole Nation, and the Agua Caliente Band of Cahuilla Indians responded that the children were not eligible for membership. DPSS also sent notice of the contested 18-month review hearing and the section 366.26 hearing to the Seminole Nation of Oklahoma, the Seminole Tribe of Florida, and the Agua Caliente Band of Cahuilla Indians.

In July 2024, when the court asked Father about Indian ancestry, Father told the court, "Miccosukee Tribe of Indians, Florida Seminole, and then I got El Santo off of— here in California." The court followed up on that information by asking, "So Seminole Florida and Agua Caliente Florida. [¶] Is that everything?" Father unequivocally answered, "Yes." As ordered by the court, DPSS contacted the Agua Caliente Band of Cahuilla Indians and the Seminole Tribe of Florida, both of which confirmed that the children were not enrolled or eligible.

The record thus reflects that the court and DPSS repeatedly asked the parents, extended family members, and identified tribes about Indian ancestry, despite the early evidence that neither parent had any Indian ancestry and that any contrary claims by Father—whose mother was from Mexico and whose father was from Cuba—may have been disingenuous. When Father mentioned the Miccosukee Tribe for the first and only time at a hearing in the last month of this case (which had been pending for over two years), the court immediately followed up with Father, listed two of the tribes that Father had mentioned, and asked if that was everything. Father answered that it was. The court did not abuse its discretion by taking Father at his word. And for all of these reasons, the court did not abuse its discretion by implicitly finding that the ICWA investigation was adequate and proper.

Father also argues that the court erred by not making an express finding at the section 366.26 hearing that ICWA did not apply. But a case cited by Father shows that his argument is meritless: "'While the record must reflect that the court considered the

issue and decided whether ICWA applies, its finding may be either express or implied.' [Citations.] . . . [A]n implicit ruling suffices, at least as long as the reviewing court can be confident that the juvenile court considered the issue and there is no question but that an explicit ruling would conform to the implicit one." (*In re E.W.* (2009) 170 Cal.App.4th 396, 404-405.)  Given the trial court's extensive and repeated inquiries concerning ICWA—including inquiries made on the record earlier in the same month as the selection and implementation hearing—and DPSS's numerous reports of the tribes' repeated denials that the children were members or eligible for membership, we are confident that the court considered the issue.  There is no question but that an explicit ruling would conform to the implicit one.  Father's argument therefore fails.

DISPOSITION

The orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____<br>J.

We concur:

McKINSTER_____<br>Acting P. J.

FIELDS_____<br>J.